**STATE of Alaska et al., Appellants,**

v.

**Jan VAN DORT, Individually and on behalf of all persons similarly situated, Appellee.**

**No. 1790.**

Supreme Court of Alaska.

Nov. 3, 1972.

Gordon E. Evans, of Davidson, Engstrom & Evans, M. Gregory Papas, Asst. Atty. Gen., John E. Havelock, Atty. Gen., Juneau, for appellants.

Avrum M. Gross, of Faulkner, Banfield, Doogan, Gross & Holmes, Juneau, for appellee.

OPINION

Before RABINOWITZ, C. J., and CONNOR and ERWIN, JJ.

PER CURIAM.

This case concerns durational residency requirements for voting in Alaska. The facts are undisputed. Jan van Dort is a

---

resident of Alaska, residing in Juneau since his arrival in the state on or about June 17, 1972. Having passed the recent bar exam, he is permanently employed, presently working as an associate with a Juneau law firm. With the sole exception of his duration of residency, van Dort, at the times relevant to this opinion, was qualified under the laws of Alaska to register and vote in Alaska. On July 17, 1972, van Dort appeared at the elections office in Juneau, completed the appropriate registration form, and requested to be registered and certified to vote in the primary election scheduled for August 22, 1972. Election officials advised van Dort that he qualified in all respects to vote in the primary except for the fact that he would not be a resident of the State of Alaska for 75 days immediately preceding the election.[1] On August 22, 1972, van Dort would have been a resident of Alaska for only 66 days.

On July 19, 1972, van Dort filed this action on behalf of himself and all persons similarly situated. The trial court concluded, as a matter of law, that the 75-day durational residency requirement provided by AS 15.05.010(4) was unconstitutional.

The gist of van Dort's contention is that all durational residency laws, by their very nature, penalize the exercise of the right to travel freely through the United States. Therefore, they are unconstitutional as in contravention of the equal protection clause of the fourteenth amendment, unless necessary to promote a compelling state interest. Appellee cites as authority for his position Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).[2]

■ It is our reading of *Dunn* that all durational residency requirements are prima facie invalid as in contravention of the equal protection clause because they penalize the right to travel and the right to vote in elections on an equal basis with other citizens in the jurisdiction. The only durational residency requirements that will be countenanced are those which are absolutely necessary for administrative purposes.

■ The State argues that it does indeed have a compelling interest which justifies the 75-day residency requirement of AS 15.05.010. This compelling interest, it asserts, is Alaska's uniqueness in size, population, geography, cultural, social and economic problems, in comparison with the contiguous states of the Union.[3] It is

---

1. AS 15.05.010 provides in pertinent part:
   *Voter qualification.* A person may vote at any election who. . . .
   (4) has been a resident of the state for at least 75 days and of the election district in which he seeks to vote for at least 30 days just before the election; . . .

2. In Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the United States Supreme Court in an opinion by Marshall, J., affirmed the conclusion of a three-judge panel of the United States District Court that Tennessee's durational residency requirements for voting of one year in the state and three months in the county were unconstitutional. The Court held that these durational residency requirements violated the equal protection clause of the fourteenth amendment because they were unnecessary to promote a compelling state interest, either to prevent fraudulent voting by non-resi-

dents or to further the goal of having knowledgeable voters.

3. The Federal Field Committee for Development Planning in Alaska, Economic Outlook for Alaska (1971) at 14–15 summarizes this uniqueness as follows:
   "Alaska's very size, climate, and terrain impose real limitations on development . . . .
   Its location is both favorable and unfavorable. It is separated from its sister states by a foreign country—the only state to be so situated. . . .
   \*     \*     \*     \*     \*
   Alaska is the only state with a substantial portion of its population having different cultures and languages.
   Alaska has the smallest population of any state—only six cities have a population of 5,000 or more. Therefore, not one of them is large enough to qualify as a Standard Medtopolitan [sic] Statistical Area (SMSA)."

urged that the 75-day residency requirement is vital, along with the other "reasonable and logical procedures found in Alaska's election code", to "guarantee the franchise uncompromised to the state's bona fide voters".

Mindful as we are of Alaska's unique status in the Nation, we are nevertheless of the opinion that this uniqueness does not rise to the level of a compelling state interest sufficient to justify the 75-day residency requirement. Other states combine great size with a variety of climates and terrains. Hawaii is separated from its sister states by a great expanse of ocean. Other states contain several ethnic populations with their individual cultures and languages. Other states are sparsely populated. Even conceding that this combination of geographical, ethnographical, and sociological characteristics distinguishes Alaska from the rest of the Nation, we fail to see how this combination, by itself, supports a finding of administrative necessity for a 75-day period.

The State also argues that communications in Alaska and between Alaska and the rest of the Nation are far less modern, rapid, or dependable than anywhere else in the Nation, primarily because of Alaska's unique physical characteristics. While we accept the State's invitation to take judicial notice of these communication deficiencies, we cannot conclude that they justify a residency requirement of greater than 30 days.

■ In assessing the constitutionality of Tennessee's residency requirements, the United States Supreme Court said in *Dunn,*

"Fixing a constitutionally acceptable period is surely a matter of degree. It is sufficient to note here that 30 days appears to be an ample period of time for the State to complete whatever administrative tasks are necessary to prevent fraud—and a year, or three months, too much. This was the judgment of Congress in the context of presidential elections." [4] (Footnote omitted)

We read this language as setting 30 days as the maximum permissible residency period. Therefore, we affirm the judgment of the Superior Court.[5]

Affirmed.

BOOCHEVER, J., not participating.

4. 405 U.S. at 348, 92 S.Ct. at 1006. Moreover, the Court observed in a footnote that:
"In the Voting Rights Act Amendments of 1970, Congress abolished durational residence requirements as a precondition to voting in presidential and vice-presidential elections, and prohibited the States from cutting off registration more than 30 days prior to those elections. These limits on the waiting period a State may impose prior to an election were made 'with full cognizance of the possibility of fraud and administrative difficulty.' Oregon v. Mitchell, 400 U.S. 112, 238, 91 S.Ct. 260, 322, 27 L.Ed.2d 272 (opinion of Brennan, White, and Marshall, JJ.). With that awareness, Congress concluded that a waiting period requirement beyond 30 days 'does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elec-
tions.' 42 U.S.C. § 1973aa–1(a)(6). And in sustaining § 202 of the Act, we found 'no explanation why the 30-day period between the closing of new registration and the date of election would not provide, in light of modern communications, adequate time to insure against . . . frauds.' Oregon v. Mitchell, supra, 400 U.S. at 239, 91 S.Ct., at 322 (separate opinion of Brennan, White, Marshall, JJ.). There is no reason to think that what Congress thought was unnecessary to prevent fraud in presidential elections should not also be unnecessary in the context of other elections. . . ." 405 U.S. at 348–349 n. 19, 92 S.Ct. at 1006.

5. AS 15.07.040, pertaining to the closing of registration 30 days before an election, was not questioned in this case and is still operative.